In re SHELL OIL COMPANY.

No. 92–1211.

United States Court of Appeals,
Federal Circuit.

April 29, 1993.

Rehearing Denied; Suggestion for
Rehearing In Banc Declined
July 2, 1993.

Thomas J. Ward, Ward, Lazarus & Grow, of Washington, DC, argued, for appellant. With him on the brief was John T. Lanahan. Also on the brief was Kimbley L. Muller, Shell Oil Co., of Houston, TX, of counsel.

Albin F. Drost, Deputy Sol., Office of the Solicitor, of Arlington, VA, argued, for appellee. With him on the brief was Fred E. McKelvey, Sol. Of counsel were Nancy C. Slutter, John W. Dewhirst, Lee E. Barrett and Richard E. Schafer.

Before NEWMAN, MICHEL, and PLAGER, Circuit Judges.

PAULINE NEWMAN, Circuit Judge.

Shell Oil Company appeals the decision of the Trademark Trial and Appeal Board of the United States Patent and Trademark Office, refusing to register the service mark RIGHT–A–WAY and arrow design for "service station oil and lubrication change services".[1]

## Background

On September 19, 1988 Shell Oil filed application Serial No. 73/753,045 to register the following service mark:

Shell claimed use since August 5, 1988.

The examiner refused registration based on section 2(d) of the Lanham Trademark Act,[2] citing the registration on January 17, 1984 of the service mark RIGHT–A–WAY and arrow design for "distributorship services in the field of automotive parts":

1. *Ex parte Shell Oil Co.*, Serial No. 73/753,045 (Trademark Trial & Appeal Board, Dec. 16, 1991).

2. **15 U.S.C. § 1052(d).** "No trademark ... shall be refused registration on the principal register on account of its nature unless it—

. . . .

(d) Consists of or comprises a mark which so resembles a mark registered in the Patent and Trademark Office ... as to be likely ... to cause confusion, or to cause mistake, or to deceive."

# Right-A-Way

The registrant is R.A. Industries, Inc. First use in commerce on March 11, 1982 is stated in the registration.

The Board affirmed the refusal of registration, holding that there was likelihood of confusion in view of the substantial identity of the marks and their use in connection with automotive-related services.

## Discussion

■ Likelihood of confusion under section 2(d) is determined as a matter of law, on the factual record. Each case of likelihood of confusion is decided upon the particular facts of the case, *In re E.I. Du Pont de Nemours & Co.*, 476 F.2d 1357, 1361–62, 177 USPQ 563, 567 (CCPA 1973), recognizing that the various evidentiary factors may play more or less weighty roles in any particular determination. *Nina Ricci, S.A.R.L. v. E.T.F. Enterprises, Inc.*, 889 F.2d 1070, 1073, 12 USPQ2d 1901, 1903 (Fed.Cir.1989). On appeal to this court the Board's conclusion is given *de novo* review as to the ultimate question of likelihood of confusion, and the factual findings on which this conclusion is premised are reviewed for clear error. *Specialty Brands, Inc. v. Coffee Bean Distributors, Inc.*, 748 F.2d 669, 671, 223 USPQ 1281, 1282 (Fed.Cir.1984).

■ In reviewing the question of likelihood of confusion between the two marks at bar, we have given particular attention to the following factors:

## 1. The Marks

The marks are considered in their entireties, words and design. The Board placed weight on the identity of the words RIGHT–A–WAY, and the presence of an arrow design in both marks. Shell points out that there are differences in the script, as well as in the form of the arrow design. Shell argues that the arrow is the dominant feature to be compared, stating that the words "right-a-way" are descriptive or highly suggestive of the services with which they are used.

Without doubt the word portions of the two marks are identical, have the same connotation, and give the same commercial impression. The identity of words, connotation, and commercial impression weighs heavily against the applicant. *See In re Martin's Famous Pastry Shoppe, Inc.*, 748 F.2d 1565, 1566, 223 USPQ 1289, 1289–90 (Fed.Cir. 1984). We agree with the Board that the words dominate these marks, and that their differences in script and arrow design do not diminish their substantial identity when viewed as a whole.

## 2. The Disclaimer

■ Shell argues that the words are common dictionary words, and that since Shell filed a disclaimer of the words "Right–A–Way", the only issue of registration relates to the script and the arrow design. The Board correctly held that the filing of a disclaimer with the Patent and Trademark Office does not remove the disclaimed matter from the purview of determination of likelihood of confusion. *See In re National Data Corp.*, 753 F.2d 1056, 1058–59, 224 USPQ 749, 750–51 (Fed.Cir.1985) (rejecting the "tactical strategy" of disclaimer filing, in determination of likelihood of confusion).

The marks must be considered in the way in which they are perceived by the relevant public. Shell's argument that the only consideration is the "design form" of the words "Right–A–Way", omitting the words "right-a-way" because they were disclaimed, was correctly rejected by the Board.

## 3. The Services

The registrant's services were described in the registration document as "distributorship services in the field of automotive parts", and were found by the Board to include "buying

automotive parts from a manufacturer, and then distributing automotive parts on a wholesale basis to retailers who, in turn, sell the parts at retail to the ultimate consumer." The Board held that the registrant's automotive parts distributorship services and Shell's service station oil change and lubrication services were related, and would be so perceived by consumers. Shell argues on appeal that the respective services and accompanying channels of trade are different, such that there would not be a likelihood of confusion as to the source of these services. Shell states that the registrant's services are known exclusively to "jobbers". This is neither dispositive nor supported by the record. Indeed, the registrant's record before the Patent and Trademark Office included an Amendment stating that

> R.A. Industries provides management services for all its subsidiaries including accounting, data processing and planning services to the distributors and retail stores. In every instance the mark is controlled and owned by R.A. Industries.[3]

■ The services with which the marks are associated are not identical. The degree of "relatedness" must be viewed in the context of all the factors, in determining whether the services are sufficiently related that a reasonable consumer would be confused as to source or sponsorship. It is relevant to consider the degree of overlap of consumers exposed to the respective services, for as discussed in *Philip Morris Inc. v. K2 Corp.*, 555 F.2d 815, 816, 194 USPQ 81, 82 (CCPA 1977), even when goods or services are not competitive or intrinsically related, the use of identical marks can lead to the assumption that there is a common source.

### 4. Extent of Consumer Confusion

The Board described potential consumers of Shell's oil change and lubrication services as the broad class of automobile owners. Shell referred to its twelve thousand automotive service stations that would use the mark RIGHT–A–WAY. Indeed, Shell does not dispute the Board's finding that substantially all of the registrant's customers are prospective consumers of Shell's services.

■ Shell argues that the number of consumers of the registrant's services is small, and thus that confusion would be *de minimis*. However, the rights flowing from federal registration do not vary with the size of the registrant; a small business that meets the statutory requirement of providing its services "in commerce", 15 U.S.C. § 1051(a)(1), is not rationed, because it is small, in the rights secured by the Lanham Act. *See Giant Food, Inc. v. Nation's Foodservice, Inc.*, 710 F.2d 1565, 1568, 218 USPQ 390, 393 (Fed.Cir. 1983) ("15 U.S.C. § 1057(b) creates a presumption that the registrant has the exclusive right to use its mark throughout the United States"); *In re Appetito Provisions Co.*, 3 USPQ2d 1553, 1554 n. 4 (Trademark Trial & Appeal Bd.1987) (the Lanham Act "accords a registrant prima facie exclusive rights in the registered mark for the goods or services recited in the registration throughout the United States regardless of its actual extent of use.").

■ Even if the overlap between consumers of registrant's RIGHT–A–WAY services and Shell's RIGHT–A–WAY services were small in relation to the total number of Shell customers, it is not *de minimis* in relation to the registrant's customers. A newcomer does not gain the right to register a substantially identical mark[4] simply be-

3. Although we do not rely on it, the record also contains declarations under sections 8 and 15 of the Lanham Act, with a picture of the mark RIGHT–A–WAY on a delivery vehicle, hat, and jacket, and advertising material describing use of the mark at the retail level, including vehicle decals, uniforms, caps, door stickers, store valences, a lighted sign with the store name, and clocks. Although the dissent dismisses these specimens as planned future marketing, the Lanham Act requires that the specimens show "current use of the mark", 15 U.S.C. § 1058(a) [section 8], and that the affidavit show that the registered

mark "is still in use in commerce", 15 U.S.C. § 1065 [section 15]. *See Standard Havens Products, Inc. v. Gencor Industries, Inc.*, 897 F.2d 511, 514 n. 3, 13 USPQ2d 2029, 2031 n. 3 (Fed.Cir.1990) (taking judicial notice of agency action, since an "adjudicative fact" of public record and not subject to reasonable dispute).

4. Although Shell argues that its use of RIGHT–A–WAY would be in association with other Shell trademarks, the proposed registration is not so limited. Registrability is determined based on the description in the application, and restric-

cause the number of persons exposed to the registrant's mark may be small in relation to the newcomer's volume of use. The registrant/senior user is safeguarded by the trademark law, as is the consuming public, from likelihood of confusion caused by the entry of a junior user of a confusingly similar mark. *Park 'N Fly, Inc. v. Dollar Park and Fly, Inc.*, 469 U.S. 189, 198, 105 S.Ct. 658, 663–64, 83 L.Ed.2d 582, 224 USPQ 327, 331 (1985). The trademark law not only protects the consumer from likelihood of confusion as to commercial sources and relationships, but also protects the registrant and senior user from adverse commercial impact due to use of a similar mark by a newcomer.

The term "reverse confusion" has been used to describe the situation where a significantly larger or prominent newcomer "saturates the market" with a trademark that is confusingly similar to that of a smaller, senior registrant for related goods or services. *Sands, Taylor & Wood Co. v. Quaker Oats Co.*, 978 F.2d 947, 957 & n. 12, 24 USPQ2d 1001, 1010 & n. 12 (7th Cir.1992), *cert. denied*, —— U.S. ——, 113 S.Ct. 1879, 123 L.Ed.2d 497 (1993). The junior user does not seek to benefit from the goodwill of the senior user; however, the senior user may experience diminution or even loss of its mark's identity and goodwill due to extensive use of a confusingly similar mark by the junior user. *Banff, Ltd. v. Federated Department Stores, Inc.*, 841 F.2d 486, 490, 6 USPQ2d 1187, 1191 (2d Cir.1988); *Ameritech, Inc. v. American Information Technologies Corp.*, 811 F.2d 960, 966, 1 USPQ2d 1861, 1866 (6th Cir.1987).

■ The avoidance of confusion between users of disparate size is not a new concept; however, the weighing of the relevant factors must take into account the confusion that may flow from extensive promotion of a similar or identical mark by a junior user. *See DeCosta v. Viacom International Inc.*, 981 F.2d 602, 607–10, 25 USPQ2d 1187, 1191–93 (1st Cir.1992). In considering likelihood of

confusion as to the source of services that are not identical, or likelihood of confusion as to whether there is a relation between the source of the services, the extent of the registrant's and the newcomer's activities relating to the mark must be given weight appropriate to the circumstances. *See In re Du Pont*, 476 F.2d at 1362, 177 USPQ at 567 ("[w]e find no warrant, in the statute or elsewhere, for discarding *any* evidence bearing on the question of likelihood of confusion") (emphasis in original).

### 5. Sophistication of Purchasers

■ The discrimination and degree of care by users of the respective services must be considered, along with other relevant factors, and given appropriate weight.

Shell argues that the registrant's consumers are informed and deliberate users of the registrant's automotive parts distribution services, who would be unlikely to be confused by Shell's use of substantially the same mark for automotive oil change and lubrication services. The Commissioner responds that the same standard of care would not be expected to be exercised by purchasers of automotive parts from a distributor, compared with their purchase of routine oil change and lubrication services. In *Fuji Photo Film Co. v. Shinohara Shoji K.K.*, 754 F.2d 591, 596, 225 USPQ 540, 542–43 (5th Cir.1985), the court held that purchasers of expensive printing presses are not necessarily sophisticated purchasers when buying low-cost graphic arts materials. In *Weiss Associates, Inc. v. HRL Associates, Inc.*, 902 F.2d 1546, 1548, 14 USPQ2d 1840, 1841–42 (Fed. Cir.1990), this court held that even sophisticated purchasers can be confused by very similar marks. See also *Octocom Systems Inc. v. Houston Computer Services Inc.*, 918 F.2d 937, 942, 16 USPQ2d 1783, 1787 (Fed. Cir.1990), wherein this court approved the Board's reasoning that "the alleged expertise of purchasing agents ... [is] neither controlling nor persuasive.... [C]onfusion had to

---

tions on how the mark is used will not be inferred. *See J & J Snack Foods Corp. v. McDonald's Corp.*, 932 F.2d 1460, 1463, 18 USPQ2d 1889, 1892 (Fed.Cir.1991) (registrability is based on the description in the application); *Octocom Systems Inc. v. Houston Computer Services Inc.*,

918 F.2d 937, 942, 16 USPQ2d 1783, 1787 (Fed. Cir.1990) (registrability is based on the "identification of goods set forth in the application regardless of what the record may reveal as to ... the class of purchasers to which sales of the goods are directed.").

be considered with respect to users as well as actual purchasers."

The disparity in purchaser sophistication and in the standard of purchasing care distinguish the case at bar from those wherein the primary consumers of both purveyors' services are professional purchasers, as in *Astra Pharmaceutical Products, Inc. v. Beckman Instruments, Inc.*, 718 F.2d 1201, 220 USPQ 786 (1st Cir.1983), wherein the court held that purchasers of local anesthetic preparations, cardiovascular medicines, and prefilled syringes, on the one hand, and purchasers of computerized blood analysis machines, on the other hand, are distinct professionals and unlikely to be confused; or in *Electronic Design & Sales Inc. v. Electronic Data Systems Corp.*, 954 F.2d 713, 718, 21 USPQ2d 1388, 1392 (Fed.Cir.1992), wherein the court held that purchasers of the applicant's battery chargers or power supplies for electronic devices, and purchasers of the opposer's computer service systems, were mostly sophisticated consumers of these goods and thus that confusion was not likely. We discern no error in the Board's finding that the close similarity of these marks and the relatedness of the services was likely to cause confusion as to source or relatedness of the registrant's services.

### Conclusion

■ Considering all the factors, and for the reasons we have discussed, we conclude that there is a likelihood of confusion between the registrant's mark RIGHT–A–WAY and design and Shell's mark RIGHT–A–WAY and design. Doubt is resolved against the newcomer, *In re Hyper Shoppes (Ohio), Inc.*, 837 F.2d 463, 464–65, 6 USPQ2d 1025, 1026 (Fed.Cir.1988), for the newcomer has the opportunity of avoiding confusion, and is charged with the obligation to do so.

At the hearing Shell argued that doubt should be resolved by approving the application for registration, and publishing the mark for opposition. The purpose of trademark examination is for the Office to determine the issue of likelihood of confusion in *ex parte* proceedings with the applicant. The opposition procedure is intended to remedy oversight or error, not to substitute for the exam-

ination process. *See* 2 J. Thomas McCarthy, McCarthy on Trademarks and Unfair Competition § 20.01[1] (3d ed. 1992) (opposition proceedings provide "a backstop to purely ex parte examination of trademark applications").

The Board's decision is

AFFIRMED.

MICHEL, Circuit Judge, dissenting.

Because I believe that the Board's conclusion of likelihood of confusion was erroneous on the evidentiary record before it, I respectfully dissent. I would remand the case for new findings, based on record evidence instead of rank speculation, or reverse because there is no likelihood of confusion under the marketing circumstances established by the prior registration, the application-in-suit, and the other documentary evidence of record. Evidence subsequently submitted only to us may not properly be taken into account.

### I.

The Board's finding that "[c]ustomers for registrant's services *would include*, among others, service stations, automotive repair and body shops, as well as retailers of automotive parts," *In re Shell Oil Co.*, Serial No. 73/753,045, slip op. at 8 (TTAB Dec. 16, 1991) (emphasis added), was unsupported by *any* evidence of record. Although the Board may draw reasonable inferences from the evidence, it may not simply assume whom a registrant's customer base "would include." Because there was *no* record evidence identifying registrant's customers, the Board can only have based its finding entirely on its own speculative assumptions. Even if these assumptions coincidentally are correct, a finding based *only* on assumptions is, by definition, clearly erroneous.

Inasmuch as the Board's conclusion was based substantially on this clearly erroneous finding, it, too, must be erroneous. The parties' services are different and non-competing, with different channels of trade. Therefore, if, instead, the finding about customers had been that registrant sold and advertised *only* to jobbers (who, in turn, sold to retailers), the customers of registrant who might

go to applicant's service stations would all be sophisticated professionals.[1] Such a finding would have changed the entire analysis—by the Board and by us. In addition, such a finding would have blocked the majority's attempt to distinguish *Electronic Design & Sales, Inc. v. Electronic Data Systems Corp.*, 954 F.2d 713, 21 USPQ2d 1388 (Fed.Cir. 1992) (*EDS*), and *Astra Pharmaceutical Products, Inc. v. Beckman Instruments, Inc.*, 718 F.2d 1201, 220 USPQ 786 (1st Cir.1983), from the present case on the basis of disparity in sophistication.

Because assumptions can skew the legal analysis, the law is well settled that the Board's legal conclusion of likelihood of confusion must be based on more than just theoretical possibilities and speculation. *EDS*, 954 F.2d at 717, 719, 21 USPQ2d at 1391, 1393 (quoting *Witco Chem. Co. v. Whitfield Chem. Co.*, 418 F.2d 1403, 1405, 164 USPQ 43, 44–45 (CCPA 1969) and citing *Carter–Wallace, Inc. v. Procter & Gamble Co.*, 434 F.2d 794, 804, 167 USPQ 713, 720 (9th Cir.1970), respectively); *In re Bed & Breakfast Registry*, 791 F.2d 157, 159, 229 USPQ 818, 819 (Fed.Cir.1986) (Newman, J.) ("This theory, the nub of the Board's opinion, is not supported by evidence.... We are left with speculative assumption, an inadequate basis for the legal conclusion reached by the Board."). What we condemned in *Bed & Breakfast*, however, we bless here.

## II.

Even assuming, *arguendo*, that the Board's speculative finding as to registrant's customer base was correct, in my view even unsophisticated motorists would not be confused. While Shell's application for its RIGHT-A-WAY AND DESIGN mark originally defined the services used in connection with that mark merely as "Lubrication Oil Services," *see* Appendix for Appellant at 77, the amended application limits the mark's use to "*Service Station* Oil and Lubrication Change Services." *Id.* at 83 (emphasis added). It is common knowledge, indisputable, and verifiable—and hence subject to our judicial notice—that all Shell service stations have signs bearing the Pecten design. It follows, therefore, that Shell's oil change and lubrication services always have been and, per the application, always will be offered at its stations and hence in view of Shell's famous Pecten design and the name "Shell." Thus, it is not likely that *any* motorist would be confused as to the source or sponsorship of these services. Even those very few motorists who were aware of registrant's services and service mark would intuitively know that oil change and lubrication services advertised by the mark at Shell stations are sponsored by Shell and Shell only. Therefore, the Board's conclusion that purchasers of registrant's services would likely be confused upon coming to Shell stations is fanciful and contrary to common sense. It ignores the realities, well known to the motoring public, including registrant's customers, that *no* oil company offers oil change or lube (or other such) services sponsored by anyone else at its stations. Marketplace realities, however, are supposed to control likelihood of confusion analysis. *See* 2 J. Thomas McCarthy, McCarthy on Trademarks and Unfair Competition § 23.17 (3d ed. 1992).

## III.

Likewise, there is no likelihood of *reverse* confusion because *no* one, registrant's customers least of all, would think that Shell would distribute automotive parts to retail automotive parts stores, auto repair shops, body shops, or, indeed, *non-Shell* service stations. For Shell to do so would be to go into business against itself, because all of those entities compete with Shell's auto repair bays. Nor, for the very same reason, would Shell own a subsidiary, or be owned by a parent company, that did so. Thus, registrant's customers, even if unsophisticated or employing lesser care, would not likely believe that Shell and registrant were either related or owned in common by another company. Gas station patrons, including registrant's customers, understand that major oil

---

1. *Some* of the new documents offered our court on motion so indicated, although there was also a contrary indication, which is perhaps explainable (as Shell suggested) as post-decision marketing—quite different from marketing at the time of this application. Unfortunately, neither category of this evidence was before the Board.

companies operating service stations do not compete against themselves. Therefore, the majority's conclusion is erroneous under a reverse confusion analysis as well.

### CONCLUSION

In my view, at the very least this case should be remanded to the Board for a proper finding of the facts by reopening the record to consider documents such as those offered on motion to our court but not previously to the Board. Better yet, our court should simply reverse, in view of how the realities of the relevant marketplace make confusion of the marks for these dissimilar services decidedly unlikely. In my view, the potential number of relevant customers—customers of both companies—is minuscule. According to Shell's brief, they consist entirely of sophisticated buyers for jobbers. The services, moreover, are neither closely related nor competing and use different channels of trade. Yet the Board minimized these factors, established by the documentary evidence, and ignored realities in the relevant marketplace while indulging in far-ranging and implausible speculation about registrant's customers and their perceptions. This we should not condone. Only by a reversal or remand can we honor the core command of *In re E.I. DuPont DeNemours & Co.*, 476 F.2d 1357, 1362, 177 USPQ 563, 567–68 (CCPA 1973)—that each case of alleged likelihood of confusion must be decided on the particular facts of the case.